**Charles ALESSIO and wife, Waldine Iris Alessio, Plaintiffs-Appellants,**

v.

**Jerrall P. CROOK, M.D., and Baptist Hospital, Inc., Defendants-Appellees.**

Court of Appeals of Tennessee,
Middle Section at Nashville.

Feb. 24, 1982.

Application for Permission to Appeal
Denied by Supreme Court June 1, 1982.

Randall L. Kinnard, Nashville, Tenn., for plaintiffs-appellants.

Thomas A. Higgins, Noel F. Stahl, Scott Todd Price, Cornelius, Collins, Higgins & White, Nashville, Tenn., for defendant-appellee Jerrall P. Crook, M.D.

Thomas W. Schlater, Brenda R. Measells, Nashville, Tenn., for defendant-appellee Baptist Hosp., Inc.

## OPINION

LEWIS, Judge.

This is a medical malpractice suit brought by the plaintiffs Charles Alessio and wife, Waldine Alessio, against the defendant physician Jerrall P. Crook, alleging that Dr. Crook had been guilty of negligence that caused plaintiff Charles Alessio (hereafter plaintiff) to have his entire right lung surgically removed. Subsequently, an amended complaint was filed naming Baptist Hospital, Inc. (Baptist) a party defendant and alleging that Baptist was negligent in failing to cause an x-ray report to be placed in plaintiff's chart prior to his discharge from the hospital and in failing to cause Dr. Crook to timely complete a discharge summary on plaintiff.

Both defendants answered denying that they were guilty of any wrongful conduct or violated any standard of care.

The case was tried before a jury and the Honorable Hamilton Gayden, Circuit Judge. At the conclusion of plaintiffs' proof, Baptist's motion for a directed verdict was granted and the case dismissed as to Baptist. Dr. Crook's motion for a directed verdict was denied.

At the conclusion of all the proof and argument of counsel, the Trial Judge instructed the jury and, after due deliberation, the jury returned and announced that it had found the issues in favor of Dr. Crook and against plaintiffs.

Judgment was entered for Dr. Crook on the verdict. Thereafter plaintiffs' motion for a new trial as to both defendants was denied and this appeal ensued.

The facts are as follows: Plaintiff was born November 27, 1920, and he and his wife, plaintiff Waldine Alessio, reside in Nashville, Tennessee.

Plaintiff had a tonsillectomy in 1932, underwent a left-side hernia repair in 1959, a hemorrhoidectomy in 1970, and a right-side hernia repair in 1978.

In June, 1969, he experienced a throat problem and saw Dr. J. Thomas Bryan. On examination it was found that plaintiff had a generalized ulceration of the uvula of his palate which was biopsied and proven to be malignant squamous cell carcinoma. This oropharyngeal malignacy indicated cancer of the palate extending onto the left tonsil.

From June 16, 1969 through August 21, 1969, plaintiff was treated by radiation therapy in an attempt to eradicate the tumor. The radiation therapy was not successful and it was necessary for Dr. Bryan to surgically remove a portion of plaintiff's palate.

Plaintiff had no further problems until April, 1978, when he felt what he thought was a blister on the back of his throat. Dr. Bryan performed a biopsy on tissue taken from plaintiff's throat and it showed malignant squamous cell carcinoma.

Dr. Bryan then asked Dr. Crook[1] to look at plaintiff for possible surgery.

Dr. Crook admitted plaintiff to Baptist on April 24, 1978, for surgery to be done on April 25, 1978. Dr. Crook ordered pre-operative tests, including a cardiogram, chest x-rays, and blood tests. The chest x-rays were made in order to evaluate plaintiff's pulmonary function.

The April 24 chest x-ray was read and interpreted by the radiologist who rendered an x-ray report. The radiologist report showed that since a previous x-ray of January 17, 1978, the right hilum (root of the lung) had become slightly more prominent and there was a faint density superimposed over the right lower lung which was not definitely seen on the January 17 x-ray. The radiologist recommended a repeat x-ray with oblique views.

Dr. Crook performed surgery on plaintiff on April 25 by excision of one centimeter of the cancerous tumor from plaintiff's throat. Several large blood vessels were encountered during the operation and were ligated. The tumor was successfully removed.

Dr. Crook on that same day dictated a report describing plaintiff's medical history, his physical examination, and an operative report describing the procedure used in removing the tumor from plaintiff's throat.

Dr. Crook visited plaintiff in his hospital room on April 26 in order to assess his post-operative condition and at that time explained to plaintiff that repeat x-rays had been ordered because the radiologist had seen · something on the pre-operative x-ray "that he wanted to recheck, that it was probably related to chronic lung disease . . . ."

Thereafter plaintiff was taken to the radiology department to be x-rayed. At Baptist, when a patient is x-rayed the film is

developed as soon as possible. It is then labeled with the patient's name and identification, date, and hospital number. The film is read and interpreted by one of the radiologists who dictates into a recorder his interpretation of the film. A stenographer then transcribes the recording and prepares an x-ray report. The radiologist reviews the report and initials it if he approves. After the report is initialed, it is ready to be filed in the patient's chart.

The goal at Baptist is to review and file the x-ray report in the patient's chart as soon as possible. However, if an x-ray report is not in a patient's chart, the doctor knows that the report can be obtained at the radiology department or by checking with the unit clerk on the patient's floor.

In the instant case plaintiff was taken to the x-ray department on April 26 for the follow-up x-ray. The x-ray was taken and stamped "4:32 P.M." The x-ray was then interpreted and a report was dictated by the radiologist. The report was transcribed by the stenographer and initialed by the radiologist. The x-ray report showed that the oblique views confirmed the presence of consolidation in the right suprahilar area extending anterially into the right middle lobe.

Dr. Crook made his rounds between 7:00 and 8:00 A.M. April 27, 1978, and noticed that plaintiff's April 26 x-ray report was not in plaintiff's chart. While it was Dr. Crook's responsibility, and he so testified, to contact the radiologist or go to the radiology department if he wanted to see the report, he did not do so.

Plaintiff was discharged from the hospital on the morning of April 27 without Dr. Crook ever reviewing the April 26 x-ray report. The x-ray report was put in plaintiff's chart at some point after his discharge and did not come to Dr. Crook's attention until November, 1978.

Dr. Crook admitted at trial that the standard and ordinary acceptable professional practice in Nashville would have been for him to have made an inquiry on April 27

---

1. Dr. Crook's practice is in the specialty of   otolaryngology (ear, nose and throat).

when the x-ray report was not in plaintiff's file chart, to have asked about the report before plaintiff was discharged, and to have gone to radiology and looked at the x-rays if he did not have the report. He admitted that he violated the standard required and expected of him as a medical doctor and that, put in the simpliest terms possible, he was careless.

Plaintiff was discharged from the hospital on April 27 and on May 7, 1978, while convalescing at home, suffered a massive loss of blood through the mouth and nose. Plaintiff was re-admitted to Baptist and came under the care of Dr. Downey, Dr. Crook's partner. Dr. Downey, to stop plaintiff's bleeding, tied off a branch of the carotoid artery. The bleeding was controlled and plaintiff was discharged from Baptist on May 10, 1978.

Separate records are kept at Baptist for each admission. In plaintiff's case there was a separate set of records for plaintiff's April 25 admission under Dr. Crook and the May 7 admission under Dr. Downey. The attending physician for each admission dictates a discharge summary for that particular admission.

Dr. Crook stated that he did not have all the pertinent facts and, therefore, did not undertake to dictate a discharge summary upon plaintiff's discharge. He dictated the discharge summary in November, 1978, for plaintiff's April 25 admission.

A discharge summary is a summation of the pertinent facts for the patient's particular hospitalization and is not generally dictated until after the patient's discharge. There is usually a considerable time lapse between the dictation of the summary and its transcription. In this case the discharge summary dictated by Dr. Crook in November, 1978, was not transcribed until January, 1979.

After plaintiff's discharge from Baptist on May 10, 1978, he continued to see Dr. Crook at his office. Dr. Crook testified that he saw plaintiff several times and, noting his slow recovery, informed plaintiff that he "might need to see his medical doctor."

During subsequent office visits in August and October, 1978, Dr. Crook's examination of plaintiff's throat and neck revealed no adverse findings. Plaintiff still was not feeling well during these visits and was "urged" by Dr. Crook to see his "family doctor." Plaintiff stated that he had already undergone tests and he did not wish to undergo further tests. It was not until Mrs. Alessio insisted that plaintiff see the family doctor and made an appointment for him that plaintiff finally saw Dr. Shmerling.

Dr. Shmerling gave plaintiff a general examination on November 3, 1978, which included a chest x-ray. In reviewing the x-ray, Dr. Shmerling observed an abnormality in the right lower quadrant of plaintiff's lung and informed plaintiff that he was concerned.

Dr. Shmerling determined that plaintiff was last x-rayed in April, 1978. Dr. Shmerling went to Baptist and viewed the April 26 x-ray, making a comparison of it with the November 3 x-ray. Dr. Shmerling saw a shadow that was visible in the right hilar area which was visible on the April 26 x-ray.

Dr. Shmerling contacted Dr. Kenneth Jacobs, a chest surgeon, who suggested hospitalizing plaintiff for further testing. Plaintiff was admitted to Parkview Hospital in November, 1978, and various tests were conducted. It was determined that the entire right lung of plaintiff should be removed. Dr. Jacobs surgically removed plaintiff's right lung on November 16, 1978.

Plaintiff was discharged from Parkview Hospital on November 25, 1978, and has been followed by Dr. Shmerling since that time.

Dr. Jacobs testified that in his best medical and surgical judgment, it was necessary to remove the entire lung and that removal of the entire lung would be most likely to benefit plaintiff, bringing about a cure and prevent a reoccurrence.

The lung has an upper lobe, a middle lobe, and a lower lobe. Plaintiff's tumor arose in the middle lobe and was projecting

into the intermediate bronchus. The removal of only the middle lobe would not remove all of the tumor. While operating, Dr. Jacobs observed large and hard lower lymph nodes which were suggestive of the possible presence of cancer. He therefore determined that it was necessary to remove more than the middle and lower lobes in order to remove all of the tumor possible.

Dr. Jacobs testified that if plaintiff's lesion had been located in a peripheral area of the lung, a wedge of lung tissue or a single lobe might have been removed. He further testified that in order to remove all of what he thought was cancerous at the time he performed the surgery, it was necessary to remove the entire right lung; that if plaintiff had been referred to him in April or May of 1978 with the information contained in the April 26, 1978 x-ray report, he probably would have performed a complete removal of the lung at that time since the April 26 x-ray showed there was a mass present in the right suprahilar area which was the same suprahilar mass which Dr. Jacobs saw when he operated on plaintiff in November, 1978. Dr. Jacobs testified that he would not have felt comfortable doing anything less than the complete removal of the right lung because he would have wanted to avoid cutting across the tumor; that in surgery of the type done on plaintiff, one did not cut across cancer because a patient will ultimately die if all of the diseased tissue is not removed.

Dr. Jacobs further testified that while he would not have been happy with removing the entire lung in April if he had been the surgeon, he wasn't happy with it in November. He did not want to do a complete removal of the right lung on plaintiff in November because plaintiff had "limited pulmonary function," but that even though he "wouldn't have wanted to do it in April or May, either,—I didn't have any choice." He did not feel that he had any option at the time of the operation. After looking at the pathology report and determining that the lymph nodes were not malignant, he realized he did have an option. But this, he testified, was hindsight.

Plaintiff called as an expert witness Dr. Charles Anthony Hufnagel, a Professor of Surgery at Georgetown University Medical College and also a cardiovascular and thoracic surgeon, who testified that the probability is that the upper lobe of the lung could have been saved in May, 1978. Dr. Hufnagel also conceded that it was possible that the entire right lung might have had to have been removed in April or May, 1978.

Neither Dr. Hufnagel nor Dr. Jacobs could state to a certainty whether or not the entire right lung of plaintiff would have had to have been removed in May, 1978, if the cancer had been discovered at that time.

Plaintiff has presented five issues for our consideration. Four of these are directed to Dr. Crook and one to Baptist. We first discuss the issues pertaining to Dr. Crook.

THE COURT ERRED IN FAILING TO FOLLOW THE LAW OF *TRUAN VS. SMITH* AND IN DENYING THE PLAINTIFFS' SPECIAL REQUEST FOR INSTRUCTION NUMBER 5.

Plaintiffs' request for Instruction No. 5 is as follows:

"The plaintiffs claim that the defendants were negligent and that their negligence resulted in the failure to discover, diagnose and care for cancer in Charles Alessio's right lung in April and May, 1978, and that the cancer was not discovered until November, 1978, when his entire right lung was surgically removed: that this negligence which caused the failure to discover, diagnose and care for the cancer during the lapsed period of time from April 27, 1978 until November 3, 1978, materially increased Charles Alessio's chances of losing his entire right lung rather than a portion of his right lung had he received the careful care and treatment to which he was entitled at the hands of the defendants. If you find that the defendants, or one of them, was negligent as I have heretofore defined it, and that that negligence or want of due care materially increased the chances of Charles Alessio's having to lose his entire

right lung rather than a portion thereof if the requisite degree of care had been exercised, then the failure to exercise that care would in this case be the proximate or direct cause of Charles Alessio's loss of his entire right lung rather than a portion thereof."

After denying plaintiffs' request, the Trial Court instructed the jury regarding negligence and proximate cause as follows:

"Now, this is what is known as a medical malpractice lawsuit where there are certain allegations. And under the law in a malpractice action, the claimant shall have the burden of proving by evidence the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred.

\*　　\*　　\*　　\*　　\*　　\*

"Another thing that has to be proved is that the defendant acted with less than or failed to act with ordinary and reasonable care in accord with such standard. "The third thing, that as a proximate result of the defendant's negligence, act, or omission, the plaintiff suffered injuries which would not otherwise have occurred. Now, the mere fact of an injury alone does not raise a presumption of the defendant's negligence in this case.

"And the Court charges you that the science of medicine is not an exact science. In this lawsuit, the plaintiffs' claim that the defendant was negligent and that his alleged negligence resulted in the failure to discover, diagnose, and care for cancer in Charles Alessio's right lung in April and May of 1978; and that the cancer was not discovered until November of 1978, when his entire right lung was surgically removed; and that this alleged negligence was the failure to discover, diagnose, and care for the cancer during the lapsed period of time from April 27, 1978, until November 3, 1978; and that it caused Charles Alessio to have his entire right lung, rather than a por-

tion of his right lung, to be removed; and had he received the careful care and treatment to which he was entitled at the hands of the defendant, that would not have happened.

"It is an act of omission that they are alleging. If you should find that the defendant was negligent, as I have heretofore described to you, and that negligence or want of due care caused Charles Alessio to lose his entire right lung, rather than a portion thereof, if the records (sic) of degree of care had been exercised, then the failure to exercise that care would, in this case, be the proximate or direct cause of Charles Alessio's loss of his entire right lung, rather than a portion thereof.

"Negligence is the failure to exercise ordinary care and is the doing of some act which a reasonably prudent person would not do or the failure to do something which a reasonably prudent person would do under the circumstances similar to those shown by the evidence.

"A person may assume that every other person will exercise reasonable care for his own protection under the circumstances, unless the circumstances indicate the contrary to a reasonably prudent person.

"Now, in the field of medical attention, there are certain duties from a physician to his patient. In performing professional services for a patient, the physician or surgeon has the duty to have that degree of learning and skill ordinarily possessed by physicians and surgeons of good standing practicing in the same or similar locality under similar circumstances.

"It is his further duty to use the care and skill ordinarily exercised in like cases by reputable members of his profession practicing in the same or similar locality under similar circumstances and to use reasonable diligence and his best judgment in the exercise of skill and the application of his learning in an effort to accomplish the purpose for which he is employed. A failure to do so is a form of negligence called malpractice.

"Any physician or surgeon who holds himself out as a specialist in a particular field of medical science or limits his practice to a particular specialty has a duty to possess and exercise that degree of skill, care, and learning ordinarily possessed and exercised in similar cases by members of good standing in his profession who specialize in the same field of medicine and practice in the same or similar locality.

"A physician or surgeon is not negligent simply because his efforts prove unsuccessful. It is possible for a physician or surgeon to err in his judgment or to be unsuccessful in his treatment without being negligent. By undertaking treatment, he does not guarantee a good result, but he is responsible for an injury to his patient resulting from his lack of the requisite knowledge and skill or his failure to exercise reasonable care or to use his best judgment.

"The proof of causation in a medical malpractice action cannot rest on conjecture and the mere possibility of such causation is not enough to sustain the plaintiff's burden of proof.

"I charge you that where it appears with equal probability that the damages complained of may have resulted from one or several causes or some of which the defendants would not be responsible and for one of which they might be responsible, any choice between such probable causes would be a matter of conjecture and, hence, would afford no basis of recovery.

"Now, the plaintiff has a burden of proof of proving and has stated that the defendant was negligent, that the defendant's negligence was the proximate cause of the plaintiff's injury, and that the injury resulted in damage to the plaintiff. "Proximate cause is defined. A proximate cause of an injury is a cause which in natural and continued sequence produces the injury and without which the injury would not have occurred."

In support of their contention that the Trial Judge erred in failing to charge their Instruction No. 5, plaintiffs rely on *Truan v. Smith*, 578 S.W.2d 73 (Tenn.1979). In *Truan*, Mrs. Smith filed suit against the defendant doctor for damages alleged to have been the result of defendant's negligence in misdiagnosing a malignant tumor in her breast.

The jury awarded Mrs. Smith $150,000 and her husband $35,000. The Court of Appeals affirmed. The Supreme Court granted certiorari and, in affirming the judgment, stated:

> [W]e think the jury reasonably could conclude that, in failing to detect the breast mass when he had an opportunity to do so on both November 12, 1973, and March 25, 1974, and in failing to act on the patient's complaints on March 25, 1974, Dr. Truan did not exercise that degree of care and diligence required of him in providing medical care to Mrs. Smith, and that this lapse either materially increased the chances of or accelerated Mrs. Smith's death.

*Id.* at 76.

It is plaintiffs' insistence that the Supreme Court has adopted a new standard of "causation and damages," i.e., "materially increase the chances of or accelerates . . . ." to be used in cases involving cancer. The issue in *Truan* was not the trial judge's instructions to the jury but rather, whether the defendant doctor was guilty of any negligence at all. We do not believe that a careful reading of *Truan* supports plaintiffs' insistence.

While no magic language or formula has been adopted by the appellate courts of this state which, with absolute accuracy, defines proximate cause so that it is applicable to each and every case and that a jury will always find it understandable, we are of the opinion that in the instant case the Trial Judge's instructions, taken as a whole, show that he fully and properly instructed the jury on proximate cause as defined by the courts of this state and T.C.A. § 29–26–115. T.C.A. § 29–26–115 provides, in part, that in a "malpractice action" the plaintiff "shall have the burden of proving by evidence . . . ." . . . "(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred."

It is also plaintiffs' contention that the Trial Judge made mis-statements of the law concerning his reasons for denying their special request No. 5. These alleged mis-statements were made out of the presence of the jury.

■ We are of the opinion that the Trial Judge's instructions to the jury were correct and, therefore, even if he reached his decision for the wrong reasons, he will not be reversed. *Hopkins v. Hopkins*, 572 S.W.2d 639 (Tenn.1978).

This issue is without merit.

THE TRIAL COURT ERRED IN FAILING TO GRANT PLAINTIFFS' MOTION FOR A NEW TRIAL WHEN IT WAS SHOWN THAT THE JURY'S VERDICT WAS SUCH AS TO EVINCE EXTREME PASSION, PREJUDICE, CAPRICE, PARTIALITY OR CORRUPTION ON THE PART OF THE JURY AGAINST THE PLAINTIFFS AND THE JURY ACTED UNREALISTICALLY AND CAPRICIOUSLY.

By this issue plaintiffs take the position that the removal of Mr. Alessio's right lung was in fact caused by Dr. Crook's admitted departure from acceptable medical standards and his admission that he was careless in doing so.

In support of their contention, plaintiffs cite *Loftis v. Finch*, 491 S.W.2d 370 (Tenn. App.1972). Mr. Loftis was a passenger in an automobile which was struck in the rear by defendant's automobile. She was rendered unconscious for a short time and was trapped in the burning automobile until she was rescued by another motorist. Mrs. Loftis suffered multiple cuts and bruises, as well as burns to her face and body. She was treated for injuries and released from the hospital but subsequently re-admitted suffering from intense pain in her back, neck and head.

The uncontradicted evidence at trial showed that Mrs. Loftis incurred medical expense of $1204.96, that prior to the accident she was employed as a secretary at a salary of $375 per month. Her doctor's uncontradicted testimony was that, as a result of the injuries sustained in the accident, she was totally disabled for a period of two months and retained a five percent permanent disability. She testified that at the time of trial she still had not been able to return to her regular employment and that she was working making some $20 to $25 per week.

Mrs. Loftis lost wages for two months and her medical expenses were $1954.96. This included nothing for five percent permanent disability or pain and suffering. The jury returned a verdict for Mrs. Loftis of $1500 and for Mr. Loftis in the sum of $100. The question on appeal was not one of causation but the inadequacy of the judgment.

In *Loftis* it was uncontroverted that defendant's negligence was the proximate cause of Mrs. Loftis's injuries. In the instant case while Dr. Crook admitted that he was careless and violated accepted medical standards, he denied that his negligence was the proximate cause of the removal of plaintiff's right lung. This issue was hotly contested throughout the trial with almost diametrically opposed proof from plaintiffs and defendant. The jury chose to credit Dr. Crook's witnesses on this issue and found that his negligence did not cause the loss of plaintiff's entire right lung.

Plaintiffs also cite *MacMahon v. Nelson*, 39 Colo.App. 355, 568 P.2d 90 (1977), wherein the defendant doctor misdiagnosed a lump in plaintiff's right ear lobe as a glandular inflammation when, in fact, it was a malignant tumor. Defendant admitted that he was negligent. The trial judge directed a verdict for defendant and, on appeal, it was reversed and remanded to allow the jury to determine whether plaintiff's alleged emotional injuries were due to defendant's admitted negligence.

We see no support for plaintiffs' position in *MacMahon*. The court there simply stated that causation was a jury question. Causation was decided by the jury in the instant case.

■ Plaintiffs have failed to show any direct proof or circumstances which would permit an inference that the jury was

guilty of passion, prejudice or caprice. *Kaiser v. Cannon*, 529 S.W.2d 235 (Tenn.App. 1975). This issue is without merit.

## THE TRIAL COURT ERRED IN FAILING TO WEIGH AND CONSIDER THE EVIDENCE AND GRANT THE PLAINTIFFS A NEW TRIAL WHEN IT WAS CLEAR THE JURY'S VERDICT WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE.

One of plaintiffs' grounds in their motion for a new trial was "[t]he verdict was contrary to the weight of the evidence." The order overruling plaintiffs' motion for a new trial is as follows:

This case came on to be heard ... on the plaintiffs' motion for a new trial, statement of counsel and the entire record, from all of which it appears to the Court, after due consideration, that the said motion should be denied and overruled in all respects.

Plaintiffs correctly assert that in considering a motion for a new trial on the ground that the verdict of the jury is contrary to the weight of the evidence, the trial judge has a duty to weigh the evidence to determine if it preponderates against the verdict. *James E. Strates Shows, Inc. v. Jakobik*, 554 S.W.2d 613 (Tenn.1977).

We find nothing in the record and plaintiffs have failed to show that the Trial Judge failed to exercise his duty to weigh the evidence to determine if it preponderates against the verdict. To the contrary, it appears from the record in general, and specifically from the foregoing order, that he exercised his function as the thirteenth juror, weighed the evidence and found it to be wanting insofar as plaintiffs' contention was concerned. This issue is without merit.

## THE TRIAL COURT ERRED IN FAILING TO GRANT A NEW TRIAL WHEN IT WAS SHOWN THAT DEFENDANT DR. CROOK HAD VIOLATED RULE 26 T.R.C.P. AND PLAINTIFFS WERE MATERIALLY PREJUDICED BY THE VIOLATION.

Specifically, plaintiffs contend that Dr. Crook "violated Rule 26.05 TRCP by failing to supplement answers to a key set of interrogatories" and that they did not become cognizant of the rule violation until after the trial.

Rule 26.05, Tennessee Rules of Civil Procedure, is as follows:

*Supplementation of Responses.*—A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

(3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses.

On May 12, 1980, plaintiffs served upon Dr. Crook interrogatories seeking information as to the identity of persons expected to be called as expert witnesses and the substance of the experts' testimony.

On June 25, 1980, Dr. Crook responded that he had made no determination concerning the use of an expert witness.

On March 19, 1981, Dr. Crook filed a supplemental response and advised that he would call Dr. Kenneth J. Jacobs, the sur-

geon who removed plaintiff's right lung, as an expert witness, who would, in substance, testify

that even if the April 26, 1978, x-ray report had been properly placed in Mr. Alessio's chart, and even if Dr. Crook had properly read and promptly acted upon that report, Mr. Alessio would nevertheless have had to undergo a complete rightside pneumonectomy at that time. In summary, Dr. Jacobs bases his opinion upon the following facts. The April 26, 1978, x-ray report reveals "consolidation in the right suprahilar area extending anteriorly into the right middle lobe." The hilus is an area at that part of the lung where vessels and nerves enter. When one speaks of the hilar area under these circumstances, the reference is to that central point where both pulmonary and bronchial segments branch out into the upper, middle and lower lobes of the lung. Thus, "the presence of consolidation in the right suprahilar area" as noted in the April 26, 1978, x-ray report, signifies that Mr. Alessio had a mass just above the right hilus at that time. As Dr. Jacobs will explain, this means that a complete right-side pneumonectomy would have been necessary in April, 1978, just as it was in November, 1978. Mr. Alessio's suprahilar mass could not be dealt with in the way that some peripheral masses are. That is, a mass located in some peripheral area of the lung field may possibly be eliminated by chemotherapy, radiation, or surgical intervention. However, when faced with a suprahilar mass, surgical removal of the cancerous segments is almost impossible because the mass is situated on top of the pulmonary and bronchial vessels supplying the lung. Once those vessels are removed, the lung must be removed. According to Dr. Jacobs, he would not have felt safe doing anything less than a complete right-side pneumonectomy, had Mr. Alessio's condition been brought to his attention in April of 1978 instead of November of 1978.

It is plaintiffs' insistence that Dr. Jacobs did not testify as set out above but testified that the reason he removed the entire right lung was because he was "worried there was cancer in the lymph nodes."

Plaintiffs insist that Dr. Crook became aware of this testimony on Saturday prior to the commencement of trial on Monday and was, therefore, compelled by Rule 26.05 TRCP to inform plaintiffs of the change in Dr. Jacobs' testimony.

■ Dr. Crook did furnish plaintiffs with the name of Dr. Jacobs as "an expert witness." We are, however, of the opinion that Dr. Jacobs was not an expert as contemplated by Rule 26.05 TRCP.

Rule 26, TRCP, is in all particulars material to our inquiry identical to Rule 26, Federal Rules of Civil Procedure.

Rule 26(b)(4), FRCP, is accompanied by the following from the Notes of the Advisory Committee on Rules:

"Subdivision (b)(4)—Trial Preparation: Experts. This is a new provision dealing with discovery of information (including facts and opinions) obtained by a party from an expert retained by that party in relation to litigation or obtained by the expert and not yet transmitted to the party. The subdivision deals separately with those experts whom the party expects to call as trial witnesses and with those experts who have been retained or specially employed by the party but who are not expected to be witnesses. It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness."

*Notes of Advisory Committee*, Rule 26, Federal Rules of Civil Procedure

■ An expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer in regard to the occurrence should be treated as an ordinary witness and not as an expert as contemplated by Rule 26, TRCP.

In the instant case Dr. Jacobs did not acquire his information in preparation for trial, rather it was gathered "because he was an actor or viewer with respect to transactions or occurrences" that were the "subject matter of the lawsuit." Dr. Jacobs was one of plaintiff's treating physicians. He saw plaintiff in consultation with plaintiff's family physician and, with plaintiff's consent, Dr. Jacobs performed the operation. Dr. Jacobs was available to all parties including plaintiff. Yet the record does not disclose that plaintiff or his counsel attempted to interview Dr. Jacobs, or to depose him either by deposition or interrogatories.

We find each of the issues addressed to Dr. Crook to be without merit.

We next address the issue directed to Baptist Hospital which is as follows:

THE TRIAL COURT ERRED IN DIRECTING A VERDICT FOR THE DEFENDANT BAPTIST HOSPITAL, INC. AT THE CLOSE OF PLAINTIFFS' PROOF WHEN THE PLAINTIFFS HAD PRESENTED MATERIAL PROOF THAT THE DEFENDANT HOSPITAL HAD BEEN CARELESS AND THE CARELESSNESS PROXIMATELY CAUSED COMPENSABLE INJURIES.

Plaintiffs contend that there was material evidence from which the jury could have found that Baptist was guilty of negligence.

As has been held in numerous cases in this State, the rule for determining a motion for a directed verdict requires the trial Judge and reviewing Court on appeal to look to all of the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, and to allow all reasonable inferences from it in his favor; to discard all countervailing evidence, and if then, there is any dispute as to any material determinative evidence, or any doubt as to the conclusions to be drawn from the whole evidence, the motion must be denied and the case submitted to the jury. [Citations omitted.]

*Country Maid Dairy, Inc. v. Hunter,* 57 Tenn.App. 138, 149, 416 S.W.2d 367, 372 (1967).

■ We are of the opinion after a complete review of this record that the Trial Judge did not err in directing a verdict for Baptist at the close of plaintiffs' proof. Plaintiffs have failed to carry their burden of showing that Baptist was guilty of negligence that proximately caused the removal of plaintiff's right lung.

However, even if the Trial Judge was in error in directing the verdict, the error was harmless.

Dr. Crook admitted that he did not follow accepted standards of care and was, in fact, careless when he discharged plaintiff without reviewing either the April 26 x-ray or the x-ray report. The principle issue to be decided by the jury was whether the negligence in failing to either review the x-ray report or the x-ray of April 26 caused plaintiff to have his right lung removed. The jury by its verdict found that negligence of Dr. Crook in failing to review the x-ray report or x-ray was not the cause of plaintiff's loss of his entire right lung.

Therefore, even if Baptist was negligent in failing to place the x-ray report in plaintiff's chart or to follow up to see that Dr. Crook dictated his discharge summary, its negligence would not be the proximate cause of plaintiff's having his right lung removed.

This issue is without merit.

The judgment of the Trial Court is affirmed with costs to plaintiffs and the cause remanded to the Trial Court for the collection of costs and any further necessary proceedings.

CANTRELL and CONNER, JJ., concur.