# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### OCTOBER 9, 2007 Session

## EMMANUAL SMALL, by Next Friend, and Mother, JUANITA SMALL RUSSELL v. SHELBY COUNTY SCHOOLS, a/k/a BOARD OF EDUCATION OF SHELBY COUNTY SCHOOLS

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006185-002     D'Army Bailey, Judge**

---

**No. W2007-00045-COA-R3-CV - Filed February 12, 2008**

---

This is a negligence claim brought by a student against a school board pursuant to the Tennessee Governmental Tort Liability Act. The plaintiff, a student at Millington Middle School, began experiencing breathing problems after physical education class. The physical education teacher was unaware of the student's asthma, or the fact that the student was mentally retarded. The mother came to school and picked up her son, who was later taken to Le Bonheur Children's Medical Center in Memphis, where he remained for six months. The mother then brought a negligence claim on behalf of her son against the school board. During discovery, the student's attorney failed to disclose the student's treating doctor as an expert witness. The school board sought to exclude testimony from the doctor concerning causation of the student's injuries and the reasonableness and/or necessity of the medical charges. The court allowed the testimony concerning causation and necessity, but excluded testimony related to reasonableness. In its answer, the school board failed to raise the affirmative defense of comparative fault. On the first day of trial, the court granted the school board leave to amend its complaint to include the comparative fault of other individuals, including the student's mother. After a bench trial, the circuit court entered a judgment in favor of the student in the amount of $3 million dollars, but reduced that award to $130,000 pursuant to the Governmental Tort Liability Act. The student's attorney then moved for an award of discretionary costs, which the court denied. The school board appeals, alleging that it is immune from suit because its employees were performing a discretionary function. Next, the school board argues that the court erred by allowing the doctor to testify concerning causation and necessity because the student's attorney failed to disclose the doctor as an expert witness. Finally, the school board argues that the only witness that corroborated the student's claim was not credible. The student raises the issue of whether the court erred in allowing the school board to amend its answer to include comparative fault, and whether the court erred in refusing to award discretionary costs. For the following reasons, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the court, in which W. FRANK CRAWFORD, J., and HOLLY M. KIRBY, J., joined.

Henry L. Klein, Memphis, TN, for Appellant

Robert L. J. Spence, Jr., Kristina A. Woo, Memphis, TN, for Appellee

**OPINION**

## I. FACTS & PROCEDURAL HISTORY

Emmanual Small ("Appellee" or "Small") attended Millington Middle School, located in Shelby County, during the 2001 school year. Small suffered from asthma and bronchitis, and he was mentally retarded with an IQ of 60. On October 29, 2001, an incident occurred at school which is the subject of this lawsuit. Small's mother was notified to pick up her son from school because he was not feeling well after participating in physical education ("PE") class. She took Small home and began administering a breathing treatment. Small's condition did not improve and he was taken to Le Bonheur Children's Medical Center ("Le Bonheur") in Memphis, where he remained for six months. The mother brought suit on behalf of Small, alleging that Shelby County Schools ("the Board") was negligent in failing to inform its employees of Small's health issues and that the Board failed to implement a PE program for Small, taking into account his health issues.

A bench trial commenced on October 24, 2006. Prior to the presentment of proof, both parties raised motions in limine to exclude certain evidence. The Board sought to prohibit Small from reading a portion of the deposition from his witness, Dr. Grover Barnes ("Dr. Barnes"), concerning the cause of Small's alleged injuries and the reasonableness and/or the necessity of the medical charges. The Board argued that such testimony required an expert witness, and because Small failed to disclose Dr. Barnes as an expert in his answers to interrogatories during discovery, the appropriate sanction should be the exclusion of such evidence. The court ruled that the portions of Dr. Barnes' deposition concerning the cause of the injuries and the necessity of the medical treatment would be allowed, but that the reasonableness of the Le Bonheur hospital medical bills would be excluded.

Small requested that the court exclude any evidence relating to the comparative fault of Small, or any other individual, as the Board failed to raise the affirmative defense of comparative fault in its answer. The Board's answer asserted that the complaint failed to state a claim upon which relief can be granted, and also raised the defense of immunity based on the Board's discretionary functions. The Board failed to raise the affirmative defense of comparative fault. The court denied Small's motion and granted the Board leave to amend its answer to include the affirmative defense of comparative fault. The Board then filed an amended answer, which states as follows: "If it is determined that there is any fault on the part of the Board, then any such fault

should be compared with the fault on the part of the parents of Emmanual Small, Jerry Russell and Juanita Small Russell, Sylvia Small [the sister], or any other person, known or unknown . . . ."

Small called both Sylvia Small, his sister, and Juanita Small Russell, his mother, to testify. The mother enrolled Small at Millington Middle School with the help of her daughter, Sylvia Small. On Small's "Student Enrollment Data" form dated September 4, 2001, a question asks, "Does the student have any medical problems?", to which the "yes" blank is checkmarked. Below this checkmark, the sister wrote "he has asthma." The mother testified that she also returned a form to the office secretary that had been completed by Small's doctor. Sylvia Small testified that this form allowed Small to use his inhaler during school.

The mother testified that prior to 2001, Small was enrolled at two different schools, but then the family moved, and she enrolled him at Millington Middle School. At his previous schools, she testified that she was involved with school personnel in the preparation of Small's individualized education plans ("IEP"). This IEP was required because Small was a special education student. Mrs. Small testified that she received nothing from Millington Middle School concerning an IEP meeting. Around the middle of October, Ms. Jean Wannage, a social worker, came to her house to get Small's IEP information. She testified that she spoke with Ms. Wannage concerning Small's health problems. Specifically, she told Ms. Wannage that Small had to use a breathing machine every night. Mrs. Small testified that they agreed that if Small suffered any breathing problems at school, the school was to call 911. The IEP team staff meeting minutes, entered into evidence, stated under "special health needs" that Small suffered from asthma and was on a breathing machine at night. It also stated the 911 directive. Small's "Physical Education Health Form" signed by Mrs. Small asked that she "[l]ist any reasons why your child should be excluded from or have his/her physical education program modified." This line was left blank. The form also indicated that Small suffered from "high blood pressure" and "heart problems."

The mother testified that on October 29, 2001, someone from Millington Middle School called her to come pick up Small. When she arrived at the office, they called Small's classroom to send Small: "When he came out, he had his book bag and his coat. And he was dragging. I was knowing [sic] he was sick because he fell up on me when he came." When they arrived home, the mother administered a breathing treatment, but when Small did not improve, she called the ambulance. Small was taken to Le Bonheur where he remained for six months. Over this period, Small experienced lung problems which required a tracheotomy to help him breathe. He also had heart problems which required the insertion of a central line running to his heart.

On cross examination, Small's mother admitted that the physical education enrollment form stated that Small had heart problems. The mother was unsure whether this form was filled out before the incident in question, or later during the beginning of Small's seventh grade year. As to the mother's effort to notify the school concerning Small's health issues, the follow line of questioning occurred:

> Q.    Well, then you were aware, were you not, that he was taking
> physical education?

A. Yes, sir.
Q. Did you ever inquire as to what was going on in the Physical Education class, in other words, what activities he would be involved in?
A. No.

. . .

Q. Did you ever go to the Physical Education teacher and inquire of him of what activities Emmanual might be participating in?
A. No, sir.
Q. Now, I think you testified that he was going to Drummonds before you [sic] went to Millington Middle?
A. Yes, sir.

. . .

Q. So apparently, you did tell the teachers at Drummonds he was not to run; is that fair?
A. Yes, sir.
Q. Okay. But you didn't tell anybody at Millington that he was not to run?

. . .

A. That's correct.

The Board also pointed to the IEP, which Small's mother signed; specifically, to the question "Explain why the student will not participate with peers without disabilities in: . . . extracurricular and nonacademic activities", which is answered "disability does not affect his participation."

Small testified, but he could not remember the incident in question. Although he did remember participating in PE class, he did not remember the day of the injury. Small testified that he did remember going to the hospital in an ambulance and remaining there for six months. He also testified that he went to the hospital because of breathing problems.

Heather Collins, the only witness with knowledge of the events in PE class that day, testified that she knew Small for "a long time" and that he was her next door neighbor. Ms. Collins testified as to the happenings in PE class on the day in question:

Q. What activities were going on?
A. We were doing our regular warm-ups for PE so we could play games, and our physical therapy. Yes.
Q. This was the sixth grade; right?
A. Yes.

. . .

Q. And what did these warm-ups consist of?
A. Jumping jacks, push-ups, sit-ups. And then at the end, we run around the gym.

-4-

Q.	All right. And did Emmanual participate in those warm-up activities?

A.	Not so much.

Q.	Tell me what you mean.

A.	He wouldn't do a lot of them. He would particularly only do one. And that is - - I wouldn't consider him called [sic] running because it wasn't actually running for him.

Q.	What would you call it then?

A.	Fast paced walking.

Q.	All right. Was that how Emmanual ran, he fast paced walked?

A.	Yes.

. . .

Q.	And what happened?

A.	Well, after two laps, I'll say, around the gym, Emmanual grabbed his chest and stopped.

Q.	Okay.

A.	And I was just coming around and I saw him. And I stopped and I asked him if you need your inhaler. And he slowly shook his head yes. And I ran around to Coach Coleman - -

. . .

Q.	Was [Coach Coleman] the only instructor in Phys Ed that day?

A.	Yes.

Q.	. . . What happened?

A.	I asked - - I told him that Emmanual needs his inhaler. And Coach Coleman told me not to worry about it. So I ran on.

Q.	Did you continue to observe Emmanual?

A.	Yes.

. . .

A.	I observed that Coach Coleman didn't do anything. And Emmanual sat down when everyone else was sitting down, and after we ran. And we were going to do our regular games in the gym. And Emmanual sat against the wall and he did not participate in that.

Q.	Did Coach Coleman ever go up to Emmanual, give him his - -

. . .

Q.	- - inhaler or he went up to him?

A.	No. He went up to him. He never gave him his inhaler.

Q.	Do you know what he said to him?

A.	I only caught the last part.

Q.	All right. What part was that?

A.	You need to keep running.

. . .

A. He tried. But I could see it was difficult for him.

Q. During the remainder of the class while the other students played games, what did Emmanual do, if anything?

A. He had to run again because - - and I had to too, because I interfered with Coach Coleman's decision.

. . .

Q. Was it punishment?

A. You could say that.

Q. And how much further were you and Emmanual required to run?

A. Two laps.

Q. All right. After those punishment laps were completed, could you tell what Emmanual's condition was?

A. Bad. I can't really explain it. All I know is he continued to hold his chest.

Q. Was he having problems breathing?

A. Yes.

Q. Was he ever allowed to get his inhaler?

A. Not that I saw. No.


Richard Coleman ("Coach Coleman"), Millington Middle School's physical education ("PE") teacher, testified that if physical disabilities are brought to his attention, then he makes special accommodations for those students. As to students with asthma, he testified as follows:

Q. So you will tailor your accommodations to the impairment?

A. Yes, sir.

. . .

Q. What kind of accommodations do you make for students who have asthma?

A. I always insist that a student has their inhaler with them, and by law they are supposed to be able to have their inhaler with them at all times.

. . .

Q. Right. One of the roles that you have as their instructor is to monitor their activities so they don't overexert themselves?

A. Yes, sir.

Q. But you have to know first; right?

A. You have to know first, yes, sir.

Q. Do you remember Emmanual Small as a student in your class?

A. I remember Emmanual for two reasons; number one, he came in after the regular school year had started, and I showed him

> where to sit. The other time I can remember Emmanual he was absent a lot from school . . . .
>
> . . .
>
> A. Yes. I did not know the reason why he was absent, but, you know, other than that, I have no recollection of Emmanual.
>
> Q. At all?
>
> A. At all.
>
> . . .
>
> Q. All right. When Emmanual started school, did anyone in the principal's office advise you that Emmanual Small was asthmatic?
>
> A. No, sir.
>
> Q. Did anyone in the principal's office advise you that Emmanual Small had to have an inhaler with him at all times?
>
> A. No, sir.
>
> Q. Is that the kind of information that is normally customarily provided to you by the principal's office?
>
> A. Yes, sir, and also the parent.
>
> . . .
>
> Q. Tell me how the office would normally transmit information to you about a student who had a physical problem such as asthma?
>
> A. There would be a copy made and put in my box.
>
> Q. A copy made of what?
>
> A. . . . they would have a sheet that says, you know, he is an asthmatic or he has a heart problem, or he has vision problems and then that would be brought to my attention.
>
> Q. And in this case that did not happen, did it?
>
> A. I never have seen anything on Emmanual until after this lawsuit was served.

Coach Coleman testified that had he known of Small's medical problems, he would have developed a PE program specifically for Small. He also testified that he was unaware of the IEP for Small, including the direction to call 911 if Small experienced breathing problems. Coach Coleman testified that he did not know of Small's mental impairment.

As to the events on the day in question, Coach Coleman could not remember Ms. Collins coming up to him in class to complain about Small. Nor did he see Small fall to the ground or hear him complaining about a breathing problem. Coach Coleman denied that he would have made Small gotten up to run "punishment" laps.

Regina Castleberry ("Principal Castleberry"), Millington Middle School's principal, testified concerning the health issues of students and how that information is disseminated during the enrollment process:

Q. Okay. What would have been the proper procedure?

A. At the end of enrollment, the medical clerk in the school, if there is a medical clerk, and due to tax problems there hasn't always been one, we've just relied upon secretaries taking care of those situations, they will go through all of these medical - - these enrollment forms, and all information, as far as the demographics, is put into the computer about the child.

Q. Yes, ma'am.

A. If there is a special situation, it is red flagged. All administration has access, when they look up that child, to see that information. Also, if a child has special situations that may deem necessary for a teacher to know about, copies are made and given to any teacher that the child would have.

Q. And so, in particular, would the information about his medical problem have been red flagged?

A. Yes, it should have been.

. . .

Q. And is the information that's been red flagged then disseminated to teachers or instructors that the child will interact with?

A. That's what we try and do.

Q. That would have been the policy and procedure?

A. That's just the procedure that we try to follow, yes.

Q. Okay. And the reason that you have that procedure is why?

A. Is to meet the child's needs physically.

Q. Okay. And how do you ensure that the information to meet the child's needs physically has been disseminated to all teachers and instructors in the school?

A. We depend on each person to take care of their particular responsibility. . . . Also, a school nurse will come in, and those are from the health department, and they go back through and cross check also.

. . .

Q. All right. I misunderstood you. So it would have been the medical clerk's responsibility to disseminate the information about Emmanual - - about Emmanual's physical health need to the teachers and instructors that he had?

A. Any child that has a health need that's noted, yes.

Q. All right. Now, you also told us that there's a nurse that plays some part in this. What role does the nurse play?

A. Nurses come out periodically from the health department; again, depending on their availability due to taxes . . . . And they come in and they check records . . . .

-8-

Q. All right. And do you know if the nurse, in fact, did that with Emmanual's records during the fall of '01?

A. I do not.

Principal Castleberry testified that she was not aware of Small's medical problems until after the suit was filed:

Q. But, for whatever reason, you were not made aware of it?

A. Right. We have many, many, many children.

. . .

Q. But I think you've also told me that it was your expectation that within two weeks everybody that needed - - that needed to know should have been apprised by this medical clerk?

A. If it is a situation that would be detrimental for the child for the particular people not to know that, yes.

Q. Right. And certainly a medical problem of asthma could be detrimental to the child?

A. Could be.

Q. So that's the kind of information that you would want disseminated to the teachers and instructors?

A. Yes.

Concerning the IEP process, Principal Castleberry testified as follows:

Q. Just tell us what the process is and the time involved, please, ma'am.

A. Once the school receives a special ed file through the parent or through another school, a meeting is set up as soon as possible. A letter is typed by the special ed clerk, and it is either mailed or sent home by the child, or both, to get the information to the parent.

. . .

A. Then, after ten days, if there is no - - if the parent does not come, then we send it home by the child, or both.
And, if it's the second request, the clerk will call home to try and get in touch with the parent . . . .
By law, then if the parent does not show then you can have the meeting without the parent and then try to get in touch with the parent and go over the best way you can the information.

. . .

Q. And then as part of the process - - well, how many people are involved? . . .

A. Well, it depends on the case involved, but not every teacher of the child is on the team, . . ., but you have one regular

-9-

teacher, at least one special ed teacher, you have an administrator, the parent and any other personnel that's needed depending on the case.

Then from there, after the minutes have been taken and the IEP has been finalized, then that information is disseminated . . . . [A]ny information that teachers need is disseminated to all teachers . . . .

Q.  How long does that usually take?

A.  It - - practically we would like to get it done in two weeks, but that doesn't always happen. That's just our practical procedure that we would like to do.

She also testified that Small's physical health problems would have been part of his individualized assessment. As to the PE class, she testified that it was a required course. She admitted that there were no accommodations made for Small's health problems pursuant to the IEP, which was in violation of the school's Special Education Handbook. As to Coach Coleman's lack of knowledge concerning Small's medical condition, she testified that "[t]he ideal procedure is that he [Coach Coleman] would be informed, yes."

Dr. Barnes' deposition testimony was heard concerning the necessity of Small's medical expenses and the cause of Small's injuries on the day in question. Dr. Barnes, a pediatrician, assumed care of Small when he came out of the intensive care unit at Le Bonheur. Dr. Barnes had staff privileges at several hospitals, including Le Bonheur. Dr. Barnes testified that Small was admitted to Le Bonheur in October of 2001 for "respiratory distress secondary to what's called status asthmaticus, meaning he was having a severe asthma attack." Dr. Barnes testified that it is very important to treat a patient having an asthma attack as quickly as possible, because "if you deprive oxygen, if you're deprived of oxygen, it has a - - I guess you'd call it a ripple effect, starts to affect other organs, kidneys, brain, heart. Those are the big three." Upon admission to the hospital, Small had developed pulmonary hypertension and suffered heart failure. Dr. Barnes testified that pulmonary hypertension was "usually fatal. I mean, it usually causes shortening of life . . . ." Dr. Barnes knew of Small's asthma and obesity prior to his hospitalization in October of 2001, but Small did not previously have heart failure or primary pulmonary hypertension. As to the cause of Small's change in health condition before his October 2001 hospitalization and after this stay, Dr. Barnes testified as follows:

Okay. His hospitalization seemed to have been precipitated by an overexertion in Physical Education. From what I can gather, he was required to run laps in the gym, something to that effect, and that he expressed respiratory distress, was not allowed to use his inhalant, and that precipitated a severe asthma attack and that caused his hospitalization and his admission to the Intensive Care Unit . . . ."

Dr. Barnes stated that the testimony he gave was based "upon a reasonable degree of medical certainty."

As to the necessity of Dr. Barnes' treatment of Small, the following exchange occurred:

> Q. Okay. And now, Doctor, has your treatment of Emmanual Small been medically necessary?
> A. Yes.
> Q. And did your office make these charges or charge Emmanual Small or his mother for these services that you have provided?
> A. Yes.
> Q. Okay. Is his medical bill an accurate reflection of your office's charges for services rendered to Emmanual Small?
> A. Yes, I think so.
> Q. Okay. Are you familiar with the customary charges for what a pediatrician in this community would charge?
> A. Yes.
> Q. Okay. And these charges that you've charged Emmanual Small, are these charges reasonable?
> A. I think so.

Dr. Barnes also testified that the treatment Small received at Le Bonheur was medically necessary. Dr. Barnes testified that the charges Small incurred at Le Bonheur was reasonable, but as discussed above, the trial court ruled that this testimony would not be considered.

Because Dr. Barnes' testimony concerning reasonableness was excluded, Small called Bart Benson, a financial counselor of Methodist Healthcare. Mr. Benson testified that Small's medical bills at Le Bonheur totaled $894,462.28, and that he believed those charges were reasonable.

The court entered the judgment on December 5, 2006, finding that the Board was negligent and that its negligence proximately caused Small's injuries. Applying the principles of comparative fault, the court allocated 20 percent of fault to Small's mother, and 80 percent to the Board. The court found that Small's damages amounted to $3,000,000, but that pursuant to Tenn. Code Ann. § 29-20-403, damages were capped at $130,000. Thereafter, Small moved for an award of discretionary costs as provided by Rule 54.04(2) of the Tennessee Rules of Civil Procedure. On January 6, 2007, the court denied Small's motion for discretionary costs, reasoning that "such an award would be improper in that it would result in a judgment for an amount in excess of $130,000, which is the maximum award allowable to Plaintiffs under the Governmental Tort Liability Act."

## II. ISSUES PRESENTED

Appellant timely filed their notice of appeal and presents the following issues for review, which we slightly reorder and rephrase:

1.      Whether the trial court erred in finding that the Board's failure to follow its procedure for gathering and disseminating information concerning student health problems did not constitute a discretionary act for purposes of immunity under the Governmental Tort Liability Act?

2.      Whether the trial court erred in denying the Board's motion in limine to exclude Dr. Barnes' testimony concerning causation and the necessity of medical charges because Small failed to disclose Dr. Barnes as an expert witness?

3.      Whether the trial court erred in finding that the testimony of Heather Collins was sufficiently credible to support the verdict in favor of Small?

We slightly rephrase the following issues raised by Appellee:

4.      Whether the trial court erred in allowing the Board to amend its answer to include the affirmative defense of comparative fault and in apportioning 20 percent of the fault to Small's mother?

5.      Whether the trial court erred in denying Small's motion for discretionary costs because such an award would exceed the $130,000 maximum award under the Governmental Tort Liability Act?

For the following reasons, we affirm the decision of the circuit court.

### III.   STANDARD OF REVIEW

As to a trial court's conclusions of law, we employ a *de novo* standard upon the record with no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). On the other hand, we review the trial court's factual findings from a nonjury trial *de novo*, and we will not overturn such findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d) (2007); *Campbell*, 919 S.W.2d at 35.  The evidence  preponderates against a trial court's finding of fact if  it supports another finding of fact with greater convincing effect.  *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).

We afford great deference to the trial court's factual findings concerning witness credibility. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001).  The trial court sitting "as the trier of fact had the opportunity to observe the manner and demeanor of all of the witnesses as they testified from the witness stand." *Whitaker v. Whitaker*, 957 S.W.2d 834,

837 (Tenn. Ct. App. 1997); *see also* **Wells v. Tennessee Bd. of Regents**, 9 S.W.3d 779, 783 (Tenn. 1999) ("[T]rial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations."). Therefore, "[t]he weight, faith, and credit to be given the witnesses' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." **Whitaker**, 957 S.W.2d at 837. Thus, we will not reexamine the court's assessment of credibility unless there exists clear and convincing evidence to the contrary. **Wells**, 9 S.W.3d at 783; *see also* **ARC LifeMed, Inc. v. AMC-Tennessee, Inc.**, 183 S.W.3d 1, 24 (Tenn. Ct. App. 2005) ("[A]ppellate courts routinely decline to second-guess a trial court's credibility determinations unless there is concrete, clear, and convincing evidence to the contrary.").

When reviewing a trial court's decision concerning a motion to amend a pleading, we will not disturb that decision unless the trial court abused its discretion. **Sallee v. Barrett**, 171 S.W.3d 822, 825–26 (Tenn. 2005) (citations omitted). "A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." **Kincaid v. SouthTrust Bank**, 221 S.W.3d 32, 42 (Tenn. Ct. App. 2006) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)).

## IV.   DISCUSSION

### A. Immunity

We begin by addressing the issue of whether the Board should be immune from suit because its employees were performing a discretionary function. We find that the Board is not entitled to immunity, because the failure to follow policy concerning the dissemination of Small's medical information was operational as opposed to discretionary.

The Governmental Tort Liability Act ("GTLA") provides that governmental entities are "immune from suit for any injury which may result from the activities of such governmental entities wherein such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a) (2000). The discretionary function exception reads as follows:

> *Immunity from suit of all governmental entities is removed* for injury proximately caused by a negligent act or omission of any employee within the scope of his employment *except* if the injury arises out of:
>
> (1) the exercise or performance or the failure to exercise or perform *a discretionary function*, whether or not the discretion is abused.

Tenn. Code Ann. § 29-20-205 (emphasis added). This section grants immunity to local governmental entities for their employee's negligence when the injury results from "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." **Doe v. Coffee County Bd. of Educ.**, 852 S.W.2d 899, 907 (Tenn. Ct. App.

1992). Our Supreme Court has explained the discretionary function exception as preventing "the use of tort actions to second-guess what are essentially legislative or administrative decisions involving social, political, economic, scientific, or professional policies or some mixture of these policies." *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73, 84–85 (Tenn. 2001) (citations omitted).

Acts that are operational in nature, however, are not afforded this same immunity as those acts considered discretionary. "Under the planning-operational test, decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity." *Bowers v. City of Chattanooga*, 826 S.W.2d 427, 430 (Tenn. 1992). Courts are to consider the following factors in determining whether a decision is discretionary, and thus the governmental entity is entitled to immunity from suit:

> (1) whether the course of conduct was determined after consideration or debate by an individual or group charged with the formulation of plans or policies;
> (2) whether the decision resulted from an assessment of priorities by an individual or group responsible for formulating plans or policies; and
> (3) whether the decision is not of the type properly reviewable by courts which are typically ill-equipped to investigate and balance numerous factors that go into executive or legislative decisions.

*Chase v. City of Memphis*, 971 S.W.2d 380, 383–84 (Tenn. 1998). "On the other hand, operational decisions may be generally classified as ad hoc decisions made by an individual or group not charged with the development of planning or policy decisions that stem from a determination based on preexisting laws, regulations, policies, or standards." *Id.* (citation omitted). An act or omission is operational if it involves 1) conduct in the absence of policy guiding the act or omission, or 2) conduct that deviates from the established policy or plan. *Brown v. Hamilton County*, 126 S.W.3d 43, 48 (Tenn. Ct. App. 2003) (citations omitted).

Turning back to the present case, the Board argues that its decisions "as to the procedure to be employed to gather and disseminate information concerning health problems of students were discretionary decisions." The Board has misstated the argument. Small is not arguing that the Board chose the wrong policy or should have chosen a better method of disseminating information; rather, the argument goes that the Board was negligent by deviating from its policy. Thus, we are not dealing with the problem of having to second guess an executive decision, *see Hill v. Lamberth*, 73 S.W.3d 131, 135 (Tenn. Ct. App. 2001), and looking to the aforementioned principles, we believe that the acts/omissions in this case were operational. The Board had a procedure for disseminating the medical concerns of students to each student's respective teachers. The policy was not followed in this case, as Ms. Castleberry testified. Coach Coleman also testified that had he known of Small's medical problems, he would have tailored a physical program to meet his needs. This failed to

happen with Small, and because the aforementioned constitutes an operational act, immunity is removed.

### B. Discovery: Expert v. Treating Physician

We next decide whether the trial court erred in including Dr. Barnes' deposition testimony concerning the cause of Small's medical injuries and the necessity of such medical charges. The Board argues that because such testimony must come from an expert witness, and that Small's attorney failed to disclose Dr. Barnes as an expert during discovery, the testimony should have been excluded. Small argues, on the other hand, that Dr. Barnes testified in the capacity of a treating physician, and therefore, they did not have to disclose him as an expert witness.

"[D]iscovery should enable the parties and the courts to seek the truth so that disputes will be decided by facts rather than by legal maneuvering." *White v. Vanderbilt University*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999) (citations omitted). Rule 26.02(4) of the Tennessee Rules of Civil Procedure provides for the following discovery concerning expert witnesses:

> (4) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (1) of this rule and *acquired or developed in anticipation of litigation or for trial*, may be obtained only as follows:
> (A)(i) A party may through interrogatories require any other party to identify each person *whom the other party expects to call as an expert witness at trial*, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

(emphasis added). Parties also have a duty to supplement their answers as follows:
> (1) A party is under a duty seasonably to supplement the party's response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of that testimony.

Tenn. R. Civ. P. 26.05.

The rules of discovery allow for the parties to narrow the issues in order to avoid "trial by ambush." *Austin v. City of Memphis*, 684 S.W.2d 624, 632 (Tenn. Ct. App. 1984). Trial courts have the authority, in certain circumstances, to exclude the testimony of an expert witness when that party failed to name the witness during discovery. *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121, 137 (Tenn. 2004); *see also Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988). On the other hand, parties do not have a duty to name an expert witness, as required by Rule 26 of

the Tennessee Rules of Civil Procedure, if that witness acquired the information as "an actor or viewer in regard to the occurrence," and did not acquire the information in preparation for trial. *Alessio v. Crook*, 633 S.W.2d 770, 779 (Tenn. Ct. App. 1982). In *Alessio*, the plaintiffs argued that the defendant failed to supplement answers to interrogatories concerning the testimony of an expert witness. *Id.* at 778-79. The Middle Section of this Court held that the witness in dispute, the treating surgeon, gathered his information "'because he was an actor or viewer with respect to transactions or occurrences' that were the 'subject matter of the lawsuit.'" *Id.* at 780. Thus, the witness should be treated as an ordinary witness, and not as an expert witness subject to the disclosure requirement of Rule 26. *Id.* at 779.

Subsequently, the Eastern Section of this Court addressed a similar issue in *Buckner v. Hassell*, 44 S.W.3d 78 (Tenn. Ct. App. 2000). In *Buckner*, the plaintiff failed to disclose a witness, her treating physician, as an expert. The plaintiff then tried to elicit testimony from this witness concerning the standard of care for dermatologists. *Id.* at 81. Distinguishing the case from the *Alessio* decision, the Eastern Section found that although the witness was one of the plaintiff's treating physicians, "the substance of the excluded testimony involved matters outside [the doctor's] mere treatment of [the plaintiff]." *Id.* at 84. Unlike the witness in *Alessio*, the witness in *Buckner* obtained his information relating to the applicable standard of care from his own "expertise and experience," and not from just participating in the treatment of the plaintiff. *Id.* Thus, the Court found that this testimony concerning the standard of care rendered this witness an expert under the Tennessee Rules of Civil Procedure. *Id.*

The Board argues that this case is more akin to the *Buckner* decision, because the deposition testimony of Dr. Barnes concerning causation, reasonableness,[1] and necessity of the medical charges was drawn from his expertise and experience, and not as an actor or viewer in Small's treatment. We disagree. In *Buckner*, the witness in question clearly did not obtain his knowledge of the applicable standard of care by treating the plaintiff. But in this case, Small's attorney sought to introduce testimony concerning the cause of Small's injuries, not the standard of care, as this is not a medical malpractice case. It cannot be said that the substance of Dr. Barnes' testimony involved matters outside the treatment of Small; rather, information related to the cause of Small's injuries came from his involvement with the treatment. This case is more in line with *Heath v. Memphis Radiological Professional Corp.*, 79 S.W.3d 550 (Tenn. Ct. App. 2001). In this post *Alessio* and *Buckner* case, this Court addressed the same issue of whether the testimony of a witness should be excluded because the defendants failed to supplement their answers to interrogatories, naming the

---

[1] The Board argues that "[i]t is also well settled under Tennessee law that the reasonableness and necessity of medical expenses must be established through expert testimony." The Board cites to the unpublished case of *West v. Hudson*, 1988 WL 122431, at *2 (Tenn. Ct. App. Nov. 18, 1988), but this case stands for the exact opposite proposition concerning reasonableness. In *West*, the appellant argued that the office manager of the physical therapists who performed services on the plaintiff was not qualified as an expert to testify as to the reasonableness of the therapy charges. *Id.* The court expressly rejected this argument, finding that the manager could properly testify as to the reasonableness of the charges. *Id.* In any event, the trial court in this case ruled that the deposition testimony concerning Dr. Barnes' assessment of the reasonableness of the medical charges would not be considered, so this argument is moot. Nor has the Board raised on appeal the issue of whether the Le Bonheur employee, Mr. Benson, was qualified to testify as to the reasonableness of the medical charges, and thus we will not address that question.

witness as an expert. *Id.* at 559. The witness was one of the plaintiff's treating physicians who the plaintiff previously listed as a person with knowledge of the facts. *Id.* We applied *Alessio* and held that the witness acquired his knowledge through the plaintiff's treatment and thus, could testify as an ordinary witness. *Id.* Likewise in this case, we believe *Alessio* is on point and hold that Dr. Barnes obtained his knowledge and information concerning Small's injuries through the treatment of Small. Thus, the trial court did not err by considering the deposition testimony of Dr. Barnes.

### C. Witness Credibility

The Board argues that the trial court should have discredited the testimony of Heather Collins because of the "inconsistencies" between her testimony and that of other witnesses; her mental problems; and her "issues" with Ms. Castleberry and Coach Coleman. **(Appellant B p65).** We disagree.

As we have previously discussed, we do no reexamine the trial court's determination of witness credibility unless there exists clear and convincing evidence to the contrary. We find no such evidence in the record. Ms. Collins was the only witness with knowledge of the events in PE class that day. While the Board points to her "inconsistent" testimony concerning whether Small ran laps or "walked fast," the trial court discussed that issue when it pronounced its ruling from the bench:

> She said he didn't run, but he fast paced walking [sic], and would only do one activity. And on the day in question she talked about after two laps around the gym, he grabbed his chest and stopped. Well, is she making this up? I don't think so. I think this is something she would remember.
> . . .
> And of course, [Ms. Collins] talked about whether the coach made [Small] do extra laps. I believe that. Not that I think it's critical to the proof . . . . The coach was working in the blind though. So I do believe that the sequence of events as testified to by Heather Collins, at least on the standard of preponderance of proof, are more likely than not true.

As to the inconsistency of Ms. Collins' testimony, the Board argues in its reply brief that her testimony was inconsistent with her deposition. The problem with this argument is that the Board failed to impeach Ms. Collins concerning any inconsistencies at trial, and this new issue cannot be raised for the first time on appeal. In any event, as just stated, Ms. Collins was the only witness to the events of the PE class, and taking into consideration all the testimony from the other witnesses, we do not find clear and convincing evidence that we should discredit her testimony.

The Board also points to the fact that Ms. Collins told no one else about the incident on the day it occurred, except for her grandmother. Ms. Collins waited until three or four months after the

incident to tell Small's mother. The judge addressed this very issue when he pronounced his ruling from the bench:

> I mean, one could conclude that she [Ms. Collins], number one, did not correlate his health problems at that time with what happened in the class. Or number two, that she was not of maturity and sophistication, which would be consistent with what has been said about her, that she would be moved to do this. I mean, I could see that she would wait sometime until some spark came along that she would go farther than simply mentioning it to her grandmother.

As to the Board's argument concerning Ms. Collins' mental health problems, Small argues that pursuant to Rule 601 of the Tennessee Rules of Evidence, "[e]very person is presumed competent to be a witness . . . ."[2] We agree that the Board failed to raise an objection or any question as to the competency of this witness, and therefore, the issue is not preserved on appeal. But we read the Board's argument as relating to the issue of Ms. Collins' credibility, and not her competency.

Ms. Collins testified on cross-examination that she was currently on Zoloft for her "nerves," has been diagnosed with bipolar disorder and schizophrenia, and is under the care of a psychiatrist. She also testified that she has undergone anger management treatment and has been treated for suicidal thoughts. When Ms. Collins was in the sixth grade, during which the incident in PE class occurred, she took the following medications: Trileptal, Zoloft, and Respidal. We find no clear and convincing evidence that Ms. Collins' mental problems made her testimony incredible or that because of her taking the aforementioned medications she suffered from impaired capacity. The judge stated the following regarding his assessment of Ms. Collins' testimony:

> Now, much has been made about [Ms. Collins'] rambunctiousness and incidents and mental problems. *But I believe she was credible* . . . . [T]his girl answered some difficult questions and many that she didn't want to answer about herself, that she had been suicidal, that she had been disruptive at school . . . .

(emphasis added).

The Board argues that she nevertheless had a "personal vendetta against the school, Coach Coleman, and/or Ms. Castleberry," and thus her testimony was not credible.

Ms. Collins testified that she had two "run-ins" with Coach Coleman in the past:

> A.     The first time we had, the girls had to go into the girls bathroom to get dressed for PE. He [Coach Coleman] walked in.

---

[2] We point out that "[t]he determination of a witness's competency to testify is within the discretion of the trial court." **State v. Evans**, 838 S.W.2d 185, 194 (Tenn. 1992). The reviewing court will not overturn a trial court's decision concerning competency absent an abuse of discretion. *See* **State v. Caughron**, 855 S.W.2d 526, 538 (Tenn. 1993).

Q. What - - well, what did you do?
A. I told him he didn't need to walk into the girls bathroom like that.
. . .
Q. Why did you tell him that?
A. Because it's inappropriate for a male to go into where girls are dressing.
. . .
Q. Did he respond to you?
A. He said, well, then, you need to run two laps around the gym. That's what his thing is.

As to the second run-in with Coach Coleman, she testified that she and another student began pushing each other, and Coach Coleman sent both girls to the principal's office. As to Ms. Castleberry, Ms. Collins testified that she had "a lot of issues[]" with her in the past. Ms. Collins testified that she and Ms. Castleberry got into an argument and that as a result, she slapped Ms. Castleberry and was expelled from school. Ms. Collins admitted that she never "got along" with Ms. Castleberry.

After considering the aforementioned testimony, we find no clear and convincing evidence that Ms. Collins' problems in the past with these two teachers and the school should result in her testimony being discredited. The court found that she had no personal interest in the outcome of this litigation: "But does that mean that she can't tell the truth at all, that she, that we suddenly, therefore, say that we discredit her about this event which she has no interest in, at least that's not been shown, to come here to lie." As our Supreme Court has stated:

> Testimony of witnesses should be evaluated [by the trial judge] . . . upon the basis of the reasonableness or unreasonableness of the testimony given, the interest, bias, prejudice or lack thereof on the part of the witnesses, their general credibility, their opportunity to see and observe and all of the other standards and criteria applicable to factual decisions in a non-jury civil action.

*Bearden v. Memphis Dinettes, Inc.*, 690 S.W.2d 862, 866–67 (Tenn. 1984). We find no evidence indicating that the judge in this case improperly evaluated the testimony, and we find a lack of clear and convincing evidence to disregard his assessment of credibility.

### D. Comparative Fault

Small argues that the trial court erred by allowing the Board to amend its answer to include the affirmative defense of comparative fault. Further, Small argues that the trial court erred by apportioning 20 percent of fault to Small's mother. The Board argues that the trial court did not abuse its discretion by allowing the Board to amend its complaint, nor did the court err by apportioning fault to Small's mother.

Rule 8.03 of the Tennessee Rules of Civil Procedure provides that "a party shall set forth affirmatively facts in short and plain terms relied upon to constitute . . . comparative fault (including the identity or description of any other alleged tortfeasors), . . . and any other matter constituting an affirmative defense." Trial courts have great discretion, though, in allowing parties to amend their pleadings. *Biscan v. Brown*, 160 S.W.3d 462, 471 (Tenn. 2005) ("The rules relating to amendment of pleadings are liberal, vesting broad discretion in the trial court."). Rule 15.01 of the Tennessee Rules of Civil Procedure provides that "a party may amend the party's pleadings only by written consent of the adverse party or by leave of court; and leave shall be freely given when justice so requires." Thus, it is within the trial court's discretion to allow the defendant to amend his answer, even to assert an affirmative defense, and "even if such a motion is not made until the time of trial." *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 691 (Tenn. Ct. App. 1999); *see generally Steed Realty v. Oveisi*, 823 S.W.2d 195, 197 (Tenn. Ct. App. 1991) ("[I]t is a matter of discretion whether the court will allow the filing of a plea of the statute of limitations after the trial has begun").

Turning back to the present case, the trial court granted the Board's motion to amend its answer.[3] Small relies on *George v. Alexander*, 931 S.W.2d 517 (Tenn. 1996), to support his argument that the trial court erred in allowing such an amendment. We agree with the Board that the *George* decision is distinguishable from this case. In *George*, our Supreme Court held that a defendant could not attribute fault to another person at trial if the defendant failed to name that person in the pleadings. *Id.* at 521. In *George*, the defendants failed to raise comparative fault in the pleadings, but also failed to amend their answer to include the defense of comparative fault. *Id.* at 519. Therein lies the distinction between *George* and the present case. The trial court granted the Board leave to amend its answer to include the affirmative defense of comparative fault, and thus, *George* is not dispositive.

Rather, the issue is whether the trial court abused its discretion in allowing the Board to amend its answer. When making such a determination, the trial court should consider several factors, including: whether the amendment would cause undue delay; whether the opposing party has sufficient notice; whether the party seeking the amendment is acting in bad faith; whether the deficiencies have not been cured in previous amendments; whether the amendment would be futile; and whether the amendment would cause undue prejudice. *Newcomb v. Kohler Co.*, 222 S.W.3d

---

[3] The Board asked the trial court for leave to amend its answer to conform to the evidence, apparently under Rule 15.02 of the Tennessee Rules of Civil Procedure, which provides as follows:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment[.]

A Rule 15.02 motion, however, "must by its very nature be filed following presentation of evidence concerning the issue in question." *George v. Building Materials Corp. of America*, 44 S.W.3d 481, 486 (Tenn. 2001). The Board made this oral motion, but did not file a written motion to amend. From the record it appears that the Board filed its amended complaint on the fourth day of trial, at which time Small's mother had already testified. In any event, Small fails to raise this argument on appeal, and thus we will not address it.

368, 384 (Tenn. Ct. App. 2006). "[T]he primary factor to be considered by the trial court . . . is whether the plaintiff will be unduly prejudiced by the defendant's delay in raising the affirmative defense." *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 691 (Tenn. App. 1999). Concerning any prejudice Small might suffer, the trial court made the following comments:

> But I think - - my impression is that the plaintiff is stretching to try to find some matters of factual prejudice with regard to what the defense contends that it wants to rest its hat on as it relates to its comparative fault claims.
> . . .
> I do not believe that it's prejudicial to the point that it should not be allowed as an amendment.
> . . .

The Board's attorney deposed Small's mother prior to trial on October 17, 2006, in which the Board posed questions to her concerning her efforts to notify the school concerning Small's health issues.[4] We cannot say that the trial court abused its discretion by allowing the Board to amend its answer to include the defense of comparative fault.

Next, we turn to the issue of whether the trial court erred in apportioning 20 percent of fault to Small's mother. We review a trial court's apportionment of fault between the parties *de novo* with a presumption of correctness. *Cross v. City of Memphis*, 20 S.W.3d 642, 645 (Tenn. 2000). From our own review of the record, it cannot be said that the trial court erred by allocating 20 percent of fault to the mother. The mother testified that she informed Small's previous schools that he was not to run because of his health problems, but she failed to inform Millington Middle School of this information. As she testified, she knew Small was enrolled in PE, yet made no inquiries as to what activities he was invovled in, nor did she protest his enrollment in such a class. The Board, though, should be assigned a higher degree of fault in that the mother reported Small had asthma, yet Coach Coleman knew nothing about it. As discussed previously, policy was not followed, which in turn left Coach Coleman in the dark about Small's health issues. In sum, we agree with the trial court's apportionment of fault in this case.

### E. Discretionary Costs

Small argues that the trial court erred in refusing to award him discretionary costs even though such an award would exceed the maximum award under the GTLA. We find that the trial court did not err.

A trial court may award discretionary costs pursuant to Rule 54.04(2) of the Tennessee Rules of Civil Procedure. However, under the GTLA, the maximum recoverable amount in this case is $130,000. *See* Tenn. Code Ann. §§ 29-20-404(a) and 29-20-403(b)(2)(A) (Supp. 2007). The issue,

---

[4] Small argues that he was prejudiced because his attorney did not depose the mother prior to trial. As the trial court pointed out, the mother was one of Small's own witnesses, and we agree with the trial court that Small was "stretching" to make an argument that he suffered any prejudice.

then, is whether an award of discretionary costs is proper if that award would increase the total award above the $130,000 cap. This question has already been answered in the negative.

The Eastern Section of this Court addressed this issue in *Cox v. Anderson County Highway Department*, No. E1999-01697-COA-R3-CV, 2000 WL 250126, at *8 (Tenn. Ct. App. Mar. 7, 2000). In Cox, the trial court entered an award for the plaintiff in the amount of $130,000 pursuant to the GTLA, and also awarded the plaintiff his discretionary costs in the amount of $3,440.98. *Id.* at *1. On appeal, the defendant argued that such an award of discretionary costs caused the total award to exceed the statutorily-set maximum. *Id.* at *8. The Court of Appeals agreed, finding that a compensatory award of $130,000 added to an award of discretionary costs was in violation of the statute. The Court reasoned as follows:

> There is nothing in T.C.A. §§ 29-20-404(a) and 29-20-403 to indicate that an award of discretionary costs is an exception to the absolutely-stated monetary limitation of the GTLA. Whether an award of discretionary costs and/or post-judgment interest should be an award separate and apart from, and not subject to the $130,000 limitation of the GTLA, is a policy decision properly left to the judgment of the General Assembly and not to the courts. As we understand the relevant statutes, the legislature has decided that all awards to the plaintiff are subject to the one limitation of $130,000.

*Id.* at *8. Thus, the Court reversed the award of discretionary costs.

Subsequently, this Court revisited the issue in *Shaffer v. Shelby County*, No. W2000-02215-COA-R3-CV, 2002 WL 54389, at *10 (Tenn. Ct. App. July 8, 2002). There, a jury found the defendant liable for the wrongful death of the plaintiff in the amount of $12,039,049.01. The court reduced the award in accordance with the GTLA to $260,000.00. *Id.* at *1. The trial court also awarded the plaintiff discretionary costs in the amount of $5,434.55. *Id.* We reversed the trial court's award of discretionary costs, following the reasoning employed in *Cox*, that the legislature carved out no exception for any award over and above the statutorily-set limit. *Id.* at *10.

Small, nevertheless, relies on *Willis v. Kirk*, No. 01A01-9312-CV-00537, 1994 WL 265835, at *6 (Tenn. Ct. App. June 17, 1994) to support his contention that he is entitled to an award of discretionary costs even though such an award would exceed the statutorily-set limit. This reliance on *Willis* is misplaced, though, as that opinion is distinguishable from the subsequent opinions of *Cox*, *Shaffer*, and the case at bar. In *Willis*, the trial court awarded the plaintiff $325,000 for the negligence of the defendant. The Court of Appeals reduced this amount pursuant to the GTLA to the amount of $130,000. *Id.* at *4. The trial court also awarded the plaintiff discretionary costs in the amount of $5,279.15. On appeal, the defendants' argument "predicated upon the assumption that the judgment of the Trial Court would be reversed by this Court, and that the plaintiff would not be the 'prevailing party' and not entitled to discretionary costs." *Id.* at *6. The defendants failed to raise the argument that the trial court lacked the authority to award discretionary costs because such an award would exceed the maximum limit. Thus, *Willis* is not controlling, and looking to the aforementioned cases, we hold that the trial court correctly denied Small's motion for an award of

discretionary costs, as such an award added to the compensatory award would exceed $130,000. We agree with Small that the GLTA "is silent regarding the award of discretionary costs," but as discussed in *Cox*, we are unwilling to read an exception to the monetary limitation of the statute where none lies. Such policy decisions are best left to the legislature.

## V. Conclusion

For the aforementioned reasons, we affirm. Costs of this appeal are taxed one-half to the Appellant and its surety, and one-half to the Appelllee, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P. J., W.S.